ATTORNEY FOR APPELLANT
Kathleen A. Young
Kokomo, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Joby Jerrells
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 34S02-0502-CR-58

AARON REEMER,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Howard Superior Court, No. 34D01-0310-FB-367
The Honorable Michael P. Krebes, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 34A02-0406-CR-463

**October 25, 2005**

**Boehm, Justice.**

We hold that expert witnesses or laboratory results are not required to prove the composition of an over-the-counter or prescription drug when it is found in an unaltered state and its weight and contents are described in the required labeling.

**Facts and Procedural History**

Over-the-counter cold and allergy tablets containing ephedrine or pseudoephedrine are a principal source of chemicals used in the manufacturing of methamphetamine. For that reason,

in recent years retailers have been requested to report any customers who purchase quantities of products containing those compounds.[1]  In October 2003, Kurt Heibler, a Loss Prevention Detective employed by Meijer, a major retailer, gave Kokomo Police Detective Bruce Rood video surveillance tapes which showed Aaron Reemer purchasing two or three boxes of generic nasal decongestant.  A few hours later Heibler learned that Reemer had returned to the store with a companion, and the two men had purchased multiple boxes of the same product in separate transactions using self-checkout terminals.  Heibler called Detective Rood, and Rood in turn contacted Captain Michael Holsapple.  Heibler and two other Meijer's employees followed Reemer and his companion out of the store and observed them enter a silver Grand Am where a third person had been waiting.  Before the Grand Am left the parking lot, Holsapple and Rood arrived at Meijer in separate vehicles.

Reemer and the others eventually left the Meijer parking lot in the Grand Am and pulled into the adjacent Meijer gas station where Rood and Holsapple observed one of the passengers exit the car and deposit "something" into the trashcan.  After the car left, Holsapple found the only contents of the trashcan were a receipt and several empty nasal decongestant boxes.  When the Grand Am left the store, Rood followed it until it stopped at another gas station.  Holsapple shortly arrived at the station, and he and Rood approached the Grand Am, identified themselves as police officers, and searched the vehicle where they found twenty-four "blister packs" containing a total of 576 tablets.

The state charged Reemer with conspiracy to commit dealing in methamphetamine, as a Class B felony, and possession of a precursor, a Class D felony.  The court in a bench trial acquitted Reemer of the conspiracy charge but found him guilty of possessing a precursor.  To sustain a conviction for possession of a single methamphetamine precursor, under the version of the statute in place at the time, the state had to prove that the defendant possessed "more than ten (10) grams of ephedrine, pseudoephedrine or phenylpropanolamine, the salts, isomers or salts of isomers" of these compounds.  I.C. § 35-48-4-14.5(b) (2004).[2]

---

[1] This reporting obligation is now formalized in the "Meth Protection Act," P.L. 192-2005, Sec. 9, effective July 1, 2005.  Ind. Code Ann. § 35-48-4-14.7(f) (West Supp. 2005).

[2] As of July 1, 2005, perhaps in response to the Court of Appeal's decision in this case, "pseudoephedrine hydrochloride" has been explicitly added to the list of "chemical reagents or precursors" in this section.

The state offered into evidence the discarded labels from the boxes of nasal decongestants found in the trashcan to prove the weight and content of the tablets found in Reemer's possession.[3]  The labels stated that the tablets contained "pseudoephedrine hydrochloride."  Reemer objected, arguing that the labels constituted inadmissible hearsay.  The court admitted the labels under the "Market Reports, Commercial Publications" exception provided by Evidence Rule 803(17).[4]

On appeal Reemer contended that the trial court's admission of the labels was error and also that the state failed to prove that "pseudoephedrine hydrochloride" and "pseudoephedrine" are "one and the same thing, or that one is a derivative of the other."  The Court of Appeals reversed, holding that the statute described pseudoephedrine as a precursor of methamphetamine, but the tablets contained pseudoephedrine hydrochloride, and "the State failed to prove that pseudoephedrine hydrochloride is a salt of pseudoephedrine."  Reemer v. State, 817 N.E.2d 626, 630 (Ind. Ct. App. 2004).  In view of this holding the hearsay issue was mooted and not addressed.  We granted transfer.  Reemer v. State, 831 N.E.2d 736 (Ind. 2005).

### I. Drug Labels as Hearsay

Hearsay is an out-of-court statement made by someone other than the declarant and offered to prove the truth of the matter asserted.  Ind. R. Evid. 801(c).  The labels on the boxes were offered to prove the contents of the drugs, and thus were inadmissible hearsay unless some exception applies.  The trial court found the labels on the nasal decongestant boxes to be hearsay but admitted them under the "Market Reports, Commercial Publications" exception.  Ind. R. Evid. 803(17).  That exception permits admission into evidence of "market quotations, tabula-

---

See Ind. Code Ann. § 35-48-4-14.5(a)(39) (West Supp. 2005) (added by the "Meth Protection Act," P.L. 192-2005, Sec. 8.).

[3] At trial, the state claimed that its reason for not offering a lab report which documented the weight and chemical contents of the tablets was because its laboratory had established a policy against running tests on tablets such as the ones found in Reemer's possession.  The reason for this policy is not stated.  We assume it is because labels adequately describe the chemical makeup of commercially marketed products and laboratory resources are scarce.

[4] The state also offered the labels under Ind. Evid. R. 902(5) which allows self-authentication for "[i]nscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership, control, or origin."  On appeal, Reemer argues that the label on a product is not self-authenticating.  Since Reemer did not raise this issue at trial, it is waived.  Ealy v. State, 685 N.E.2d 1047, 1050 (Ind. 1997).  However, self-authentication merely relieves the proponent from providing foundational testimony; it is not a hearsay exception.  Id.

tions, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations."

As we observed in Hammon v. State, 829 N.E.2d 444, 448 (Ind. 2005), the Indiana Rules of Evidence do not have a counterpart to the residual hearsay exception found in Federal Rule of Evidence 807 and its counterparts in several other jurisdictions. This residual exception "allows hearsay not specifically admissible under one of the listed exceptions found in Rules 803 and 804 if it has 'equivalent circumstantial guarantees of trustworthiness' and (A) 'is offered as evidence of a material fact;' (B) 'is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts;' and (C) 'the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.'" Hammon, 829 N.E.2d at 448 (quoting Fed. Evid. R. 807). The proponent of the statement must provide sufficient notice to the adverse party before the statement can be used in a trial or hearing. Fed. Evid. R. 807. Drug labels would meet this test, given that they are regulated under both federal and state law and are relied upon by physicians, patients, and others to describe accurately the chemical makeup of a commercially marketed pharmaceutical, whether over-the-counter or prescription. See, e.g., Wirth v. State, 197 N.W.2d 731, 733 (Wis. 1972) (label on a prepackaged sealed bottle of codeine-type cough syrup was admissible because of the "probability of accuracy and trustworthiness of [the] statement").

Indiana does not have a residual hearsay exception, and the state offered the labels on the boxes under the market reports exception. Whether the labels of commercially marketed drugs come within the market reports or any other exception to the general rule against hearsay is a matter of first impression in Indiana.[5] Two other states have found drug labels admissible under the market reports exception to the hearsay rule. See Burchfield v. State, 892 So. 2d 191, 199 (Miss. 2004) (Mississippi does not have a residual exception. Label on drug box was admissible under the market reports exception); State v. Heuser, 661 N.W.2d 157, 165 (Iowa 2003) (Label from cold medicine box was offered under both the residual and market reports exceptions. The state did not meet the residual exception's notice requirements, but the court admitted the label

---

[5] In Scott v. State, 803 N.E.2d 1231, 1238 (Ind. Ct. App. 2004), the Court of Appeals found product labels sufficient to prove the contents of the product, including pseudoephedrine. However, the defendant in that case did not object on hearsay grounds.

4

under the market reports exception). The "market reports" description of admissible items as "market quotations, tabulations, lists, directories, or other published compilations" suggests that the exception exists only for "compilations." It has however been held to support admission of other published materials where they are generally relied upon either by the public or by people in a particular occupation.[6]

In the instant case, labeling of the tablets found in Reemer's possession was subject to federal and state law. A false or misleading label violates federal law. See 21 U.S.C. § 352 (1999). The Indiana "Drug, Device, and Cosmetic Act" regulates drugs introduced into commerce in this state. Like its federal counterpart, it also specifically prohibits the introduction into commerce of any drug that is mislabeled. See I.C. § 16-42-3-4. The applicable federal and state regulations require that drug labels be accurate and trustworthy. As the Iowa Supreme Court observed, "the contemporary nature of pharmaceutical practice exemplifies the inherent trustworthiness" of the labels on cold medication. Heuser, 661 N.W.2d at 164. Indeed, physicians, patients and the general public routinely rely on regulated manufacturing practices and mandatory labeling to assure that pharmaceuticals are as they are represented to be.[7] We conclude that labels of commercially marketed drugs are properly admitted into evidence under the exception provided by Evidence Rule 803(17) to prove the composition of the drug.

Reemer does not contest the conclusion that the empty boxes found in the trashcan originally contained the unopened blister packs that were in his possession. Although the loose blister packs were not in their original boxes, the boxes clearly indicated that each pack contained 24

---

[6] United States v. Cassiere, 4 F.3d 1006, 1019 (1st Cir. 1993) (published compilation generally used and relied upon by appraisers); Grossman v. United States, 614 F.2d 295, 297 (1st Cir. 1980) (merchandise catalog was admissible as commercial publication because it was a published compilation generally used and relied upon by retailers); United States v. Anderson, 532 F.2d 1218, 1225 (9th Cir. 1976) (price reports in The Wall Street Journal); United States v. Johnson, 515 F.2d 730, 732 n.4 (7th Cir. 1975) ("Red Book" listing wholesale and retail values of automobiles); Connell v. State, 470 N.E.2d 701, 706-07 (Ind. 1984) ("We sanction the admission of reports of regular markets for goods, including securities, published in newspapers of general circulation, as proof of value. . . . television listings and schedules published in newspapers and periodicals on a regular basis and intended to be relied upon by the public").

[7] Ledford v. State, 520 S.E.2d 225, 229 (Ga. Ct. App. 1999) (public can rely on labels that show a product includes a hazardous substance because "a manufacturer would have no interest in proclaiming that the product contained such a substance if in fact it did not"); State v. Rines, 269 A.2d 9, 14 (Me. 1970) ("It is a matter of judicial notice that the consumer public daily accepts as true and relies upon the assertions in labels and brands appearing on packages displayed at the supermarket."); Moore v. Dir. of Revenue, 811 S.W.2d 848, 851 (Mo. Ct. App. 1991) (citing Rines).

tablets, containing pseudoephedrine hydrochloride. The fact that the tablets were in the original unbroken blister packs is sufficient to establish that the contents remained as the manufacturer packaged them. The labels clearly listed pseudoephedrine hydrochloride as one of the active ingredients in each tablet. The trial court properly admitted the nasal decongestant labels into evidence as proof of the contents, and therefore the blister packs in Reemer's possession contained pseudoephedrine hydrochloride.

## II. Proof that the Contents were "Salts, Isomers, or Salts of Isomers"

Reemer argues that the state failed to prove that the tablets found in his possession contained one of the statutory drug precursors identified in Indiana Code section 35-48-4-14.5. The Court of Appeals agreed, holding that "the State presented no extrinsic evidence to show that pseudoephedrine hydrochloride is, in fact, pseudoephedrine or a salt of pseudoephedrine." Reemer, 817 N.E.2d at 629. Further, the Court of Appeals held that it could not take judicial notice that pseudoephedrine hydrochloride is a salt of pseudoephedrine. Id. at 629-30.

The label tells us that the compound Reemer possessed included "pseudoephedrine hydrochloride." The state provided testimony from Matthew Bilkey, an Indiana State Police Detective in the Drug Enforcement division who testified that the tablets found in Reemer's possession contained pseudoephedrine. When asked whether he based his opinion concerning the contents of the tablets on what the label on the box says, Bilkey replied, "not entirely." Neither the state nor Reemer sought elaboration on this answer. Reemer contends, and the Court of Appeals agreed, that the state failed to fill an evidentiary gap linking pseudoephedrine hydrochloride to the prohibited precursors. Reemer does not contend that pseudoephedrine hydrochloride is not a salt or isomer of pseudoephedrine; he merely contends that the state failed to prove that it is.

This Court dealt with a similar issue in Sherelis v. State, 498 N.E.2d 973 (Ind. 1986). In Sherelis the defendant argued that the state failed to prove that "cocaine hydrochloride" was a salt of cocaine. We noted that the statutory definition of "cocaine" included "any salt, compound, or derivative of coca leaves, and any salt, compound, isomer, derivative, or preparation which is chemically equivalent or identical to any of these substances." Sherelis, 498 N.E.2d at 975 (quoting I.C. § 35-48-1-1). Thus, we found that the provisions regarding cocaine "clearly

6

include[d] cocaine hydrochloride (cocaine salt)." Id. We believe that this analysis is equally applicable here.

The statute identifies "salts, isomers, or salts of isomers" of ephedrine and pseudoephedrine as equally prohibited substances. The definition of "pseudoephedrine hydrochloride" is "the naturally occurring isomer of ephedrine." Stedman's Medical Dictionary 1279 (25th ed. 1990).[8] Because pseudoephedrine hydrochloride is an isomer of ephedrine, it is within the statutory list of chemical reagents or precursors in Indiana Code section 35-48-4-14.5. Interpretation of a statute is a question of law for this Court, and there is no requirement of evidence or proof of what a word in a statute means. The state provided sufficient evidence that Reemer was in possession of this precursor to methamphetamine.

**Conclusion**

The trial court's conviction of Reemer is affirmed.

Shepard, C.J., and Dickson and Sullivan, JJ. concur.

Rucker, J., concurs in Part I and concurs in result in Part II without separate opinion.

---

[8] One need not resort to a Medical Dictionary. "Ephedrine" is "a white crystalline alkaloid . . . often in the form of a salt (as the sulfate) chiefly in relieving hay fever, asthma, and nasal congestion." Webster's Third New International Dictionary 761 (Unabridged 1963). "Pseudo" is simply "a resemblance to, isomerism with, or relationship with (a specified compound)." Id. at 1829. Thus, "pseudoephedrine" is "a . . . crystalline alkaloid $C_{10}H_{15}NO$ occurring with ephedrine and isomeric with it." Id. at 1830. "Hydrochloride" is simply "a compound of hydrochloric acid—used esp. with the names of organic bases for convenience in naming salts." Id. at 1108. Thus, "[base compound] hydrochloride" is a salt of the base compound.